1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | RICHARD OLANGO ABUKA,

12 | Plaintiff,

13 | v.

14 | CITY OF EL CAJON, *et al.*,

15 | Defendants.

16

Case No. 17-cv-89-BAS-NLS
*consolidated with*
Case No. 17-cv-347-BAS-NLS

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 54]**

17         This case consists of two consolidated cases brought against Defendants the

18 City of El Cajon and El Cajon Police Officer Richard Gonsalves.  The first case is

19 brought by Richard Olango Abuka.  (17-cv-89-BAS-NLS.)  The second is brought

20 by Taina Rozier and two minor children (C.O. and H.C.), as successors in interest to

21 Alfred Olango.  (17-cv-347-BAS-NLS.)  Both cases stem from an incident that

22 occurred on September 27, 2016, where Alfred Olango was shot and killed by Officer

23 Richard Gonsalves.

24         Presently before the Court is Defendants' Motion for Summary Judgment.

25 ("Mot.," ECF No. 54-1.)  Also before the Court is Plaintiffs' Taina Rozier, C.O., and

26 H.C.'s Opposition to the Motion.  ("Opp'n," ECF No. 56.)[1]  Defendants filed a Reply

27

28

_____

[1] Plaintiff Richard Olango Abuka joined the Opposition as to Plaintiffs' Fourth Amendment

in support of the Motion. ("Reply," ECF No. 59.) The Court held oral argument on the Motion on February 4, 2019. For the reasons stated below, the Court **GRANTS** Defendants' Motion.

## BACKGROUND

### I.  Undisputed Facts[2]

At approximately 2:03 p.m. on September 27, 2016, El Cajon Police Officers Richard Gonsalves and Josh McDaniel received a dispatch call about a potentially mentally ill man who had been seen walking into traffic. (JSUMF ¶ 1.)[3] This man was the decedent in this case, Alfred Olango (hereinafter, "Olango").[4] Gonsalves arrived at the corner of Broadway and Mollison in El Cajon, California at approximately 2:08 p.m., and was met by McDaniel. (*Id.* ¶ 3.) Neither officer saw Olango in the area. Olango's sister, Lucy Olango (hereinafter, "Lucy") approached the officers, and McDaniel got out of the car to speak with Lucy. (*Id.* ¶¶ 5–6.) Lucy had been the person who had called the police about Olango. (*Id.* ¶ 69.) Lucy stated she saw her brother near the southwest corner of Broadway and Mollison, and Gonsalves left to find Olango. (*Id.* ¶¶ 8, 9.) McDaniel asked Lucy a few more questions and then left to find Olango. (*Id.* ¶¶ 10, 11.)

At approximately 2:10 p.m., Gonsalves saw Olango in a parking lot near Los Ponchos, a taco shop. (JSUMF ¶ 12.) Gonsalves made eye contact with Olango, got out of his patrol car, and said "something . . . like 'Hey, I need to talk to [y]ou.'" (*Id.* ¶¶ 14–16.) Gonsalves was about fifteen to twenty feet from Olango and saw a bulge in Olango's right front pants pocket. (*Id.* ¶¶ 17–18.) Olango then put his right hand

---

excessive force claims. (ECF No. 58.)

[2] The following facts are taken from the Parties' Joint Statement of Undisputed Material Facts. ("JSUMF," ECF No. 60.)

[3] The dispatch report referred to the call as a "5150" and reported Olango as "mentally unstable." (Call for Service Detail Report, ECF No. 54-2, at 23.) A "5150" is "a generic term for a call involving a subject who may be mentally ill, or is having a mental breakdown." (Opp'n 1 n.1.)

[4] Before this day, the officers had never before met or heard of Olango. (JSUMF ¶ 61.)

into his right front pants pocket. (*Id.* ¶ 19.) Gonsalves clearly, calmly, and repeatedly told Olango to remove his hand from his pocket. (*Id.* ¶¶ 20–21.) Olango did not comply, and said "no" one time. (*Id.* ¶¶ 22–25.) Gonsalves also motioned taking his own hand out of his pocket to provide Olango with visual cues in case Olango did not understand the officer's verbal commands. (*Id.* ¶ 28.) Olango still did not comply, and began to back away. (*Id.* ¶ 29.) Gonsalves continued to repeat his command, and Olango continued to move backwards and sideways toward a fence and parked cars. (*Id.* ¶¶ 38–42.) At no time was Olango running away from Gonsalves. (*Id.* ¶ 76.) Gonsalves thought Olango might be under the influence of a narcotic and also did not want Olango entering any of the businesses in the strip mall or running into traffic. (*Id.* ¶¶ 31, 36, 37.) The officers had not been provided any information that Olango had injured anyone, threatened anyone, or had entered or attempted to enter any of the businesses. (*Id.* ¶¶ 65–68.) Gonsalves then un-holstered his gun. (*Id.* ¶ 43.) Gonsalves did not have a Taser, but did have pepper spray on his person, and had a baton and beanbag shotgun in his patrol car. (*Id.* ¶¶ 70–72.)

McDaniel arrived to the side of Olango and removed his Taser. (*Id.* ¶¶ 47–48.) Lucy arrived and began yelling at Olango. (*Id.* ¶ 50.) At this point, Olango was less than twenty feet from Gonsalves, and Olango removed something from his pocket and had it in both of his hands. (*Id.* ¶¶ 53–54.) Gonsalves fired four shots at Olango in less than one second, and McDaniel deployed his Taser at Olango. (*Id.* ¶¶ 57–58.) Olango fell to the ground. Gonsalves requested medical care and paramedics arrived to treat Olango, but Olango did not survive. (*Id.* ¶ 60.) The time between when Gonsalves first contacted Olango and when shots were fired was approximately one minute and thirty-three seconds. (*Id.* ¶ 65.)

It is now undisputed that Olango did not have any weapons in his possession at the time of the shooting. (*Id.* ¶ 64.) After the shooting, the officers discovered the item that had been in Olango's hand was a smoking device called a "vape." (*Id.* ¶ 62.) The recovered vape is pictured below:



It is also now undisputed that Olango was shot in the upper right arm, in the left chest, in the left shoulder, and in the neck. (*Id.* ¶¶ 79–85.) The bullet that entered Olango's arm traveled from front to back. The bullet that entered his left chest traveled from front to back, left to right, and downward. The bullet that entered his left shoulder entered the back of his shoulder. The bullet that entered his neck entered the left side of his neck. (*Id.*)

## II.    Video Footage

Two videos of the incident are available. (*See* Exhibit C to Declaration of Richard Gonsalves, ECF No. 54-2.) The Court has closely reviewed each video as well as the still frames of the videos.

The first video, labeled "Cell Phone Video," begins at the time Gonsalves and Olango are in the parking lot. Olango's back is to a white truck and he is moving backwards and sideways. Olango's right hand is in his right front pants pocket and Gonsalves is pointing a gun at Olango. Lucy enters the frame and begins yelling "Take your hands out!" Gonsalves also yells, "Take your hands out." Someone (a male) yells, "Shut the fuck up." Olango moves quickly to the left, points at someone (likely Lucy), and Gonsalves moves sideways to his right at the same pace, mirroring

Olango's steps. Olango then takes something out of his pocket, straightens both arms, and points them at Gonsalves. As depicted in the still frame below, Olango is holding something in his hands and pointing it at Gonsalves while standing in a "shooting stance."



As soon as Olango pulls the object out of his pocket and points it at Gonsalves, Gonsalves changes his stance and shoots at Olango four times in one rapid volley. Olango falls to the ground.

The second video, labeled "Los Panchos Surveillance Video," is captured from a similar but wider angle. It shows Olango enter the frame, walking backwards with his hand in his pocket. Gonsalves enters shortly after, with his gun out but holding it down at his thigh. Olango walks around the parking lot, sometimes facing and sometimes with his back to Gonsalves. His hand is in his pocket at all times. At one point, Gonsalves points his gun at Olango. A police car pulls up to the left of Olango and he looks startled and moves to his right away from the car. He moves back and forth as if trapped. Lucy then enters the frame, and the remainder is detailed above. Both videos clearly show the incident occurred during the day.

///

17cv89

III.    **Procedural History**

Plaintiff Abuka, who is Olango's father, brings a complaint for two counts under 42 U.S.C. § 1983.  One count is for violation of Abuka's right to substantive due process under the Fourteenth Amendment by interference with his familial relationship and the second count is for excessive force.  (17-cv-89, ECF No. 6.) Defendants moved to dismiss the complaint.  The Court denied the motion to dismiss the claims against Gonsalves, but granted the motion to dismiss claims of municipal liability against the City of El Cajon under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  (ECF No. 34.)  The Court granted Abuka leave to amend his complaint, but he did not do so.

Plaintiff Rozier originally brought claims for unreasonable use of deadly force; unconstitutional policy, practice, or custom under *Monell*; and wrongful death, (17-cv-347, ECF No. 5), but subsequently dismissed her wrongful death claim.  (17-cv-89, ECF No. 51.)  Abuka's case and Rozier's case have been consolidated.  (17-cv-89, ECF No. 40.)

**LEGAL STANDARD**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to

establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "The purpose of partial summary judgment 'is to isolate and dispose of factually unsupported claims or defenses.'" *Regents of Univ. of Cal. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077 (N.D. Cal. 2007) (quoting *Celotex*, 477 U.S. at 323–24).

If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970). If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Such admissions may be presented in testimony of a party's own witnesses through declarations. *See* Fed. R. Civ. Pro. 56(c)(4).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

/ / /

**ANALYSIS**

Before addressing the merits of the Motion, the Court addresses the Parties' various objections to certain pieces of evidence.

## I. Evidentiary Objections

Plaintiffs object to exhibits attached to Defendants' Motion. (ECF No. 57.) Defendants object to Plaintiffs' expert's report. (ECF No. 59-6.)

Plaintiffs object to the deposition testimony of Christine Carroll, (Exhibit G, ECF No. 54-9), and of Lakenya Lanier, (Exhibit F, ECF No. 54-8), as irrelevant to the issues in Defendants' Motion. "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are therefore "superfluous" in the summary judgment context, as a "court can award summary judgment only when there is no genuine dispute of material fact." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). The Court **DENIES** these evidentiary objections.

Plaintiffs also object to the report of Dr. Richard Gellar. (Exhibit R, ECF No. 54-20.) Plaintiffs argue the report is unsigned, inadmissible hearsay, and irrelevant. In their reply, Defendants state the unsigned version was mistakenly submitted, and attach a signed version. (*See* ECF No. 59-2.) The Court therefore **STRIKES** the unsigned report, (ECF No. 54-20), and considers only the signed report. The Court otherwise **DENIES** Plaintiffs' objections to the report.

Defendants object to and move to strike the report of Plaintiffs' expert Roger Clark. (ECF No. 59-6.) Defendants argue the report lacks foundation, is improper expert opinion and states legal conclusions. Legal conclusions formulated by an expert are not helpful to the trier of fact and are not admissible. *See, e.g., McHugh v. United States Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) (holding that expert testimony "cannot be used to provide legal meaning"). But it cannot be said that Mr. Clark's report is entirely a legal conclusion. Mr. Clark declares, inter alia, that the

officers failed to follow their training and they acted dangerously in the situation. This is Mr. Clark's opinion based on his experience and education and after reviewing the record and all documents in this case. Accordingly, the Court **DENIES** the request to strike the report. To the extent Mr. Clark improperly expresses legal conclusions, the Court does not rely on these statements. For the purpose of the instant Motion, the Court considers Mr. Clark's report only to the extent that it provides evidence from which a reasonable jury could conclude Gonsalves's use of force was excessive under the proper legal standard.

## II.     Excessive Force Claim

Plaintiffs allege Gonsalves violated Olango's Fourth Amendment rights because Gonsalves's use of force was objectively unreasonable and unconstitutional. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (citations, quotation marks, and emphasis omitted). There is no question the shooting was intentional in this case, therefore, Olango was "seized" within the meaning of the Fourth Amendment when he was shot. Thus, the issue is whether the force used during the seizure was "objectively reasonable." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989).) Defendants' argument is two-fold: first, Olango's constitutional rights were not violated because the force was reasonable and second, Gonsalves is protected by qualified immunity.[5]

---

[5] Plaintiffs argue Defendants' opposition to this claim is barred by collateral estoppel because of a decision in the pending state court case between the Parties, *Lucy Olango v. City of El Cajon*, No. 37-2017-00005331-CU-PO-CTL, filed on February 10, 2017. The judge in the state court case denied Defendants' motion for summary judgment on Plaintiff's negligence claim, finding there are triable issues regarding the reasonableness of Gonsalves's conduct.

"In determining the collateral estoppel effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel." *In re Bugna*, 33

## A.    Legal Standard

 "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham,* 490 U.S. at 396 (internal citations and quotations omitted).  To balance the interests, a court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).  The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others.  *Id.*

The *Graham* factors are not exhaustive.  *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013).  Courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "Other relevant factors include the availability of less intrusive alternatives to the force employed,

---

F.3d 1054, 1057 (9th Cir. 1994).  In California, collateral estoppel precludes relitigation of an issue previously adjudicated when the following elements are satisfied:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Hernandez v. City of Pomona*, 207 P.3d 506, 511 (2009) (internal citations omitted) (quoting *Lucido v. Superior Court*, 795 P.2d 1223 (1990)).

The issue in the state court case is whether Gonsalves was negligent; this is not identical to the issue here of whether Olango's constitutional rights were violated through the use of excessive force.  Therefore, collateral estoppel does not bar Defendants' arguments in this case.

whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)).

Taking into consideration the Ninth Circuit's admonition that an excessive force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," and that "summary judgment in excessive force cases should be granted sparingly," *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002), the Court delves into the excessive force analysis.

### B.    <u>Analysis</u>

The Court has grave concerns about how the officers handled this situation in its totality. When the officers were called to the scene, there is no dispute that Olango had not committed any crimes, had not injured or threatened anyone, and had not entered or attempted to enter any business. Olango had not put anyone in danger but himself. The officers arrived at the scene, spoke to Lucy only very briefly and then split up with no plan on how to help or ensure the safety of Olango. (*See id.* ¶¶ 9–11.) They did not discuss how to de-escalate the situation or how to approach Olango without leading to an altercation. They did not call a Psychiatric Emergency Response Team ("PERT") team. Instead, the officers separated and went to look for Olango.[6]

When Gonsalves approached Olango, Olango did not attempt to run away from Gonsalves, nor did he initially make any indication of intent to harm others or commit any crimes. There is also no dispute that Gonsalves thought Olango might be under the influence of a narcotic or might be suffering from a mental illness or

---

[6] Plaintiffs' expert opines the officers "did not follow the tactical guidelines of every POST certified law enforcement officer in their handling of the incident." (ECF No. 56-13, at 22.)

going through a mental breakdown.  (JSUMF ¶ 75.)  Indeed, the whole reason the officers were called to the scene in the first place was because Olango had been running in and out of traffic.  Olango's perceptible mental instability should have given the officers pause in determining how to handle the situation.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (finding "indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished").

Gonsalves did not have on his person nonlethal weapons such as a Taser or beanbag shotgun.  He had these items in his patrol car but for whatever reason did not bring them with him when he got out of his car to speak with Olango.  Other non-deadly alternatives were also available: the officers could have called a PERT team instead of approaching Olango themselves.  Gonsalves could have given Olango more space and attempted to speak with him rather than backing him into an enclosed space. "[I]f officers believe a suspect is mentally ill, they 'should . . . ma[k]e a greater effort to take control of the situation through less intrusive means." *Vos*, 892 F.3d at 1034 n.9 (quoting *Bryan*, 630 F.3d at 829).  Gonsalves could have waited until McDaniel, who had a Taser, arrived, considering Gonsalves knew he did not have nonlethal weapons on his person.  Gonsalves did not do this, but instead approached Olango alone.

When Gonsalves made contact with Olango, it was clear that Olango was uneasy.  As evidenced by the video and by Gonsalves's declaration, Olango was "walking backward and from side to side . . . [and] seemed to be looking in all different directions, as though he was paranoid with his surroundings and looking for an escape."  (Gonsalves Decl., ECF No. 54-2, ¶ 10.)  Olango also put his hand into his front pants pocket, and Gonsalves eventually took out his gun.  He repeatedly requested Olango remove his hand from his pocket and thus could have warned Olango that Gonsalves would use deadly force if Olango did not show his hands. Gonsalves had adequate time to make this warning.  While officers are not required

to give verbal warnings "when lives are in immediate danger," *Estate of Martinez v. City of Fed. Way*, 105 F. App'x 897, 899 (9th Cir. 2004), Gonsalves could have given a warning at any time before Olango pulled his hand out of his pocket and formed the shooting stance.

Considering the above, the Court finds Gonsalves did not reasonably attempt to resolve and take control of the situation that ultimately led to the use of deadly force. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017) (holding the court considers the totality of the circumstances and takes "into account all relevant circumstances" in determining whether a search or seizure was justified). The Court finds the above factors and the facts and circumstances of the situation surrounding the shooting weigh in favor of finding excessive force.

However, the most important factor is whether Olango posed an immediate threat to the safety of the officer. *See Graham,* 490 U.S. at 396. Gonsalves believed Olango was armed, but Plaintiffs argue this belief was unreasonable. Based on the evidence and the videos of the incident, the Court finds Gonsalves could have reasonably believed Olango was armed at that time Gonsalves used deadly force against Olango. It is true Lucy had informed the reporting officer during her 911 call that her brother did not have any weapons, (Dispatch Log, ECF No. 54-2, at 18 ("no weapons" reported at 12:58:29)), and may have even personally informed Gonsalves that her brother was not armed. (*See* Lucy Depo., ECF No. 56-4, at 130:8–10.) But the officers had reason to believe otherwise due to Olango's suspicious behavior of holding his hand in his pocket despite repeated clear and calm requests to remove his hand. And after disobeying these commands, Olango quickly pulled a metal object from his pocket, and while holding the object in his hands, moved into a "shooting stance" with his hands pointed at the officer. Gonsalves thus had a reasonable basis to suspect Olango was armed. "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might

create an immediate threat." *George*, 736 F.3d at 838.[7]

In *Cruz v. City of Anaheim*, officers were informed that Cruz was a gang member who sold drugs and carried a gun. 765 F.3d 1076, 1077 (9th Cir. 2014). The officers pulled Cruz over at a traffic stop and Cruz attempted to escape. Cruz got out of the car and ignored the officers' demands to get on the ground. He reached for his waistband and the officers fired at him. Afterwards, it was discovered Cruz did not have a weapon on his person. The Ninth Circuit held, "[i]t would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire." *Id.* at 1078; *see also Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) (holding "'the Fourth Amendment does not require omniscience,' and absolute certainty of harm need not precede an act of self-protection" (citation omitted)).

There are differences between *Cruz* and this case; here there is no dispute that the officers had not been informed Olango carried a gun, and the dispatch report even indicates they were informed he was unarmed. Olango also did not try to escape the officers. But, Olango's actions and hand movements were similar to those of Cruz

---

[7] Other witnesses to the incident also believed Olango had a gun. Lucy testified that when Olango pulled his hand out of his pocket and pointed his hands at Gonsalves: "I didn't think he had a gun because he was in my house, and when I saw that, I didn't know what it was." (ECF No. 54-10, at 66:20–22.) This indicates the only reason she did not think her brother had a gun is because she knew he did not have access to one at the time. But she did see something in her brother's hand. (*Id.* at 135:15–20.) Leony Ket, a witness to the incident, described Olango's position at the time as "a shooting stance" or "fighting stance" with his hands together at the palms and stretched out in front of his body with legs bent slightly. (Ket Depo., ECF No. 54-14, at 21:9–18.) Lakenya Lanier, another witness, testified, "I thought [Olango] had a gun. . . . the cop had every right to shoot or be killed . . . Because [Olango] most likely had a weapon." (Lanier Depo., ECF No. 54-8, at 18:20–23.) She testified when Olango pulled his right hand out of his pocket and moved into a shooting stance, "I would have thought he had a gun." (*Id.* at 21:2–12.) This witness testimony shows Gonsalves was not alone in his belief that Olango was armed.

in reaching for his waistband and Olango's strange and furtive behavior could have reasonably led Gonsalves to believe he was armed. Like in *Cruz*, whether or not Gonsalves could see anything specific in Olango's hands at the time Olango moved into a shooting stance, it was reasonable for the officer to believe Olango was armed.

In *Corrales v. Impastato*, 650 F. App'x 540 (9th Cir. 2016), the officer confronted Corrales while performing an undercover drug deal. Corrales "rushed toward" the officer while "pulling his previously concealed hand from his waistband" and formed "it into a fist with a single, hooked finger extended." The officer then fired at Corrales five times in a span of 3.3 seconds. The court found the officer's use of deadly force was not objectively unreasonable because he was justified in firing at Corrales to end the perceived threat of death or serious physical injury. Similarly, here, Gonsalves perceived Olango to be a threat when Olango pulled his hand out of his pocket and formed a shooting stance. Olango's action goes beyond merely pulling out a concealed hand with a hooked finger extended. As in *Corrales*, it was not unreasonable for Gonsalves to perceive a threat of deadly force as a result of Olango's actions.

Further, the Court disagrees with Plaintiffs that it was unreasonable for Gonsalves to think he saw a gun in Olango's hands because a gun looks different than a vape. Plaintiffs state the vape is silver and its mouthpiece tapers at the end, and contrast this with a gun which is black and has a mouthpiece that does not taper. (Opp'n 21.) Even if these distinctions were categorically true as to all guns, the differences are clearly minor and were realistically and reasonably not recognized in Gonsalves's "split-second judgment" in determining whether or not to use lethal force. *See Graham*, 490 U.S. at 396 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Plaintiffs are incorrectly imposing a perfect 20/20 hindsight onto Gonsalves's decision by asking

him to have noticed small details in the moment. *See id.* ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (citation omitted).) The Court finds it was reasonable for Gonsalves to think Olango posed an immediate threat of danger, thus, this factor weighs in favor of finding no excessive force. Given the totality of the evidence and the weighing of the above factors, the Court finds there are disputed issues of material fact as to whether the use of deadly force was reasonable in the situation.

The Court now turns to the number of shots fired. Whether or not it was reasonable to use deadly force is a different inquiry than whether it was reasonable to fire four shots. The video footage clearly shows that Olango was in a shooting stance facing Gonsalves, with both of his arms pointed toward Gonsalves, in the instant before Gonsalves fired the first shot. Gonsalves fired a total of four shots as one quick volley; there was no pause between the shots. The medical examiner of Olango's body could not opine which shot killed Olango, and determined that the shots "all killed him together." (Paunovic Depo., ECF No. 56-8, at 62:16.) But Plaintiffs argue the locations of the shots show Olango was either not facing Gonsalves, turning away from Gonsalves, or in the process of falling when Gonsalves fired his weapon. (Opp'n 23.) The medical examiner testified that it is possible Olango could have turned away from Gonsalves for at least one of the shots, as the first shot may have caused Olango's body to spin and "go down." (Paunovic Depo. 31:12–19; 47:20–48:1.) One of the bullets hit the left side of Olango's neck, therefore he would have "had to have been in some kind of rotation" with his "back or left side" facing the shooter at the time he was shot. (*Id.* at 30:5–11, 31:8–13.) Therefore, Plaintiffs argue there are disputed material facts as to whether Gonsalves continued to shoot Olango after the threat of deadly force had ended.

Given the totality of the evidence, the Court agrees with Plaintiffs that there are disputed material facts as to whether it was reasonable for Officer Gonsalves to

believe the threat had not been eliminated until after the fourth shot. While there is no requirement that an officer must "reevaluate whether the deadly threat has been eliminated after each shot," the officer may no longer shoot after the threat has been eliminated. *See Wilkinson*, 610 F.3d at 552; *accord Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (holding "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended"). One of the bullets entered the left side of Olango's neck and traveled from back to front, and another bullet entered the back of his left shoulder. Given this and the medical examiner's testimony, a reasonable jury could find that Olango fell to the ground after the first or second shot, and if so, the threat would have been eliminated at that point. Therefore Gonsalves's next shots would have been unreasonable. *Cf Corrales*, 650 F. App'x at 542 (finding the officer reasonably believed the deadly threat had been eliminated "only after Corrales was struck by his final bullet and fell to the ground"). Because it may or not have been reasonable for Gonsalves to fire all four shots, a reasonable jury could find that "the force employed was greater than is reasonable under the circumstances." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (internal quotation marks and citation omitted). In sum, there is a material dispute of fact as to whether Officer Gonsalves violated Olango's Fourth Amendment rights through the use of excessive force. But this does not end the inquiry as Gonsalves may still be protected by qualified immunity.

### C.  **Qualified Immunity**

#### 1.  **Legal Standard**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if

his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Court considers the second inquiry.

### 2.    Clearly Established Law

In determining whether the constitutional right was clearly established at the time of the conduct, courts ask whether its contours were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S.731, 739 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Courts "are particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Mattos*, 661 F.3d at 442.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658 (2012)).  In determining whether the law has been clearly established, there does not need to be "a case directly on point, but existing precedent must have placed

the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 740. The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). The dispositive question is therefore "whether the violative nature of *particular* conduct is clearly established" in the specific context of the case. *Id.* (internal quotation marks and citation omitted). The plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

The Court therefore asks whether clearly established law proves "beyond debate" that Officer Gonsalves acted unreasonably in this particular case. *Mullenix*, 136 S.Ct. at 309.  Plaintiffs argue

> it was clearly established on the date that Mr. Olango was shot that an officer who uses deadly force against a person who is armed with a weapon, but is facing away from the officer when he is shot or is in the process of turning away from the officer and/or falling to the ground when he is shot, has committed a Fourth Amendment violation.

(Opp'n 42.)  In support of this statement, Plaintiffs cite *Curnow By and Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991), and *Chien Van Bui v. City & County of San Francisco*, 61 F. Supp. 3d 877, 894–97 (N.D. Cal. 2014). In *Curnow*, the Ninth Circuit found that under the version of the events presented by the nonmoving party, the officers shot the victim in the back when the victim was not holding a weapon.  The court found qualified immunity did not protect the officers because they "could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time." 952 F.2d at 325.  In *Bui*, under the plaintiffs' version of the facts, officers shot Bui who was holding an X-Acto knife in his hand down at his side, was in a "defensive, cringing posture" shuffling towards the officers and was turning away when he was shot. 61 F. Supp. 3d at 894.

The court found because Bui did not pose "an immediate threat" to the officers, they could not use deadly force to apprehend him and were not protected by qualified immunity.

As noted above, it is disputed whether Olango was "facing away" or "falling" for any of the latter three shots, but it is not disputed that Olango was facing Gonsalves in a shooting stance immediately before the first shot and had pointed what one could reasonably have believed to be a gun after Olango held his hand in his pocket despite repeated requests to remove it. Olango had been so far non-violent and was likely mentally unstable, but it cannot be disputed that Gonsalves could reasonably have believed Olango posed a threat to him in the moment. Given these facts, *Curnow* and *Bui* therefore do not clearly establish the relevant law.

The Supreme Court recently emphasized the importance of identifying a clearly established right with specificity, particularly in excessive force cases.

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. . . . .

*City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)).

Without improperly defining the law at a high level of generality, the Court finds there is no clearly established legal authority for the proposition that Gonsalves's acts in this situation were unconstitutional. Even viewing the facts in the light most favorable to Plaintiffs, there is no case where an officer acting under similar circumstances was found to have violated the Fourth Amendment. There is simply no constitutional right—either by case law or statute—that would have required Officer Gonsalves to take what would have been the prudent steps of calling

the PERT team or backing off a little when he saw how agitated Olango was becoming. Additionally, in *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), the U.S. Supreme Court rejected a "provocation doctrine" in the context of an excessive force case. The fact that the officer could have handled the scenario leading up to the confrontation differently may be relevant to a state negligence claim, but is insufficient for a federal constitutional violation. In the absence of authorities, Gonsalves was not provided with "fair warning that [his] conduct was unlawful." *Elliot–Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010). The Court finds that Officer Gonsalves is entitled to qualified immunity on Plaintiffs' excessive force claim brought under 42 U.S.C. § 1983. The Court **GRANTS** summary judgment on this claim.

### III.    Fourteenth Amendment Claim

Defendants also move for summary judgment for Abuka's claim of interference with familial association under the Fourteenth Amendment. Plaintiffs do not address this claim in their opposition but stated at oral argument that they oppose summary judgment on the claim. Although the Court could grant summary judgment due to the lack of Plaintiffs' formal opposition, the Court will analyze the claim based on Plaintiffs' statements at oral argument.

The Fourteenth Amendment's substantive due process clause protects against the arbitrary or oppressive exercise of government power. *See County of Sacramento v. Lewis,* 523 U.S. 833 (1998). Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. "[T]he Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento,* 523 U.S. at 845–47.

"In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer]

is practical.'" *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 372 (9th Cir.1998) (internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. County of San Diego,* 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson,* 610 F.3d at 554). Illegitimate law enforcement objectives include "bully[ing] a suspect or get[ting] even." *Wilkinson*, 610 F.3d at 554.

Here, it is clear that Officer Gonsalves was in an escalating situation. Olango pulled his hand out of his pocket and moved into a shooting stance very quickly, and Gonsalves did not have time to deliberate or consider the use of force in this moment. And Plaintiff cannot point to any evidence that in this quick judgment, Gonsalves acted with the purpose to harm Olango unrelated to legitimate law enforcement objectives. Feeling threatened by Olango, Gonsalves quickly acted in self-defense with the belief that Olango had a gun. Gonsalves had never met or heard of Olango before the encounter, and there is no evidence Gonsalves had any objective to hurt or harm him as revenge or for any personal reason. The evidence only shows the shooting was done due to a belief of necessary self-defense, a legitimate law enforcement objective. Accordingly, the Court **GRANTS** the Motion for Summary Judgment for Plaintiffs' Fourteenth Amendment claim.

## IV. Detention Claim

Defendants move for summary judgment on Plaintiffs' detention claim wherein Plaintiffs allege Gonsalves "contacted" Olango, and "violently confronted" him "by approaching" Olango "with his firearm drawn and detaining [him] at gunpoint." (Case No. 17-cv-00347, ECF No. 5, ¶ 5.) Plaintiffs did not address this claim in their opposition and stated at oral argument that they do not oppose summary

judgment on this claim.  The Court **GRANTS** the Motion for Summary Judgment for Plaintiffs' detention claim.

## V.      Failure to Train / *Monell* Claim

Defendants argue there is no underlying constitutional violation to make a municipal liability claim and even if a constitutional violation is established, a failure to train was not a moving force behind the violation.  (Mot. 37.)  Plaintiffs did not address this claim in their opposition and stated at oral argument that they do not oppose summary judgment on this claim.  The Court **GRANTS** the Motion for Summary Judgment for Plaintiffs' *Monell* claim.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment in its entirety.  The Clerk is instructed to close the file of both matters 17cv89-BAS-NLS and 17cv347-BAS-NLS.

**IT IS SO ORDERED.**

**DATED: March 7, 2019**

**Hon. Cynthia Bashant**
**United States District Judge**